UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

MICHAEL J. JONES, JR.,              :

                                            :

                          Plaintiff,    :

                                            :         1:17-cv-3445-GHW

               -v -                   :

                                            :

BETH ISRAEL HOSPITAL,           :        MEMORANDUM OPINION

                                            :          AND ORDER

                         Defendant.    :

                                            :

------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/12/18

**GREGORY H. WOODS**, United States District Judge:

      Plaintiff Michael Jones, Jr. is currently incarcerated for assaulting three New York City Police Department ("N.Y.P.D.") officers in the spring of 2017. Months after the assault, Mr. Jones asserted that in the crucial hours leading up to his altercation with the police, he was neglected and discriminated against by employees in the Emergency Room of Defendant Beth Israel Hospital, and that this mistreatment was the catalyst for the violence that subsequently resulted. He alleges that the medical services he received were inadequate and wholly failed to address the mental health difficulties he was experiencing and that he explained to his attending doctors. Because of this poor treatment for his mental health, and the unjust discrimination he experienced due to his race and perceived financial status, Plaintiff attempted to end his life that day by provoking the police. After his failed suicide attempt and incarceration, Plaintiff has filed this action *pro se*, bringing claims under 42 U.S.C. § 1983 ("Section 1983"), 42 U.S.C. § 1981 ("Section 1981"), the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and New York state law against Defendant. Defendant has moved to dismiss the complaint. Because Beth Israel Hospital is not a "state actor," Plaintiff's Section 1983 claims against Defendant are dismissed. Plaintiff's Section 1981 claim is also dismissed. Plaintiff plausibly pleads a claim under the EMTALA, however, and will have the opportunity to litigate that claim.

# I.    BACKGROUND[1]

Between March 6 and 7, 2017, Plaintiff was admitted to the Emergency Room at Beth Israel Hospital for treatment after a Metropolitan Transportation Authority ("MTA") worker threw hot coffee in his face.  Complaint, ECF No. 1, ¶¶ II.C-D.  Plaintiff informed the doctor treating him for his physical injury that he was also suffering from suicidal and homicidal tendencies.  Compl. ¶ II.D.  Plaintiff has been on psychiatric medication since 2005 and was "in and out of the psych wards" of other New York City hospitals, including Bellevue, Harlem Hospital, and Woodhull Hospital, for months leading up to Plaintiff's presentment at Beth Israel.  Pl.'s Letter in Opposition to Mot. to Dismiss, ECF No. 27 ("Pl.'s Opp.") at ¶ 3, 5.  In the emergency room, Plaintiff described his personal circumstances to his attending physician—his kids were taken from him by the Administration for Children's Services ("ACS"), his younger brother had been murdered, and his wife was using drugs and cheating on him.  *Id.* ¶ 5.  As Plaintiff explained, he "had no real reason to live."  *Id.*

Despite this information, the unidentified doctor discharged Plaintiff and subsequently sent another person to speak with him about "why and how [he] was feeling."  Compl. ¶ II.D.  Because Plaintiff was discharged "without medical treatment for [his] mental state," it became his "goal to hurt a police officer [and] [he] wanted to commit suicide by a N.Y.P.D. [officer] that day."  *Id.*  Plaintiff acted on this plan after being "force[d] out of the hospital"; he assaulted three N.Y.P.D. officers.  Compl. ¶¶ IID, III.  Plaintiff was in turn assaulted and injured by those officers, and the assault on Plaintiff continued even after the officers had restrained him in handcuffs.  Compl. ¶ III.

---

[1] Unless otherwise noted, the facts are taken from the complaint and Plaintiff's opposition to the motion to dismiss and are accepted as true for the purposes of this motion.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.").  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff initiated this action with the filing of his complaint on May 8, 2017, seeking damages in the amount of $100,000,000.00, as well as payment of all medical bills in his medical history and funding for surgery for "other damage." ECF No. 1. The Court authorized Plaintiff to proceed *in forma pauperis* on August 18, 2017. ECF No. 6. During a conference on October 31, 2017, the Court granted a stay of discovery pending the briefing of, and the Court's decision of, Defendant's motion to dismiss. ECF No. 17.

Defendant filed its motion to dismiss on November 14, 2017. ECF No. 18. Plaintiff filed a letter in opposition on January 10, 2018. ECF No. 27. In that opposition, Plaintiff asserts that "if [he] had been held overnight for suicide watch and medicated[,] [he] would not have been in the position to be arrested" and because the hospital "denied [him,] now [he has] to pay with [his] life." *Id.* ¶ 5. Nonetheless, Plaintiff reduced the damages that he seeks to $150,000.00. *Id.* ¶ 2. On January 25, 2018, Defendant filed a reply in support of its motion to dismiss. ECF No. 32.

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual

allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' A complaint must therefore contain more than 'naked assertion[s] devoid of further factual enhancement.' Pleadings that contain 'no more than conclusions . . . are not entitled to the assumption of truth' otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678-79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

Because Plaintiff is proceeding *pro se*, the Court must liberally construe Plaintiff's allegations and "interpret[ ] [them] to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted); *see also, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed . . . ." (internal quotation marks and citation omitted)); *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Where . . . the complaint was filed *pro se*, it must be construed liberally to raise the strongest claims it suggests." (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013))). Nevertheless, "dismissal of a *pro se* complaint is [ ] appropriate where a plaintiff has clearly failed to meet the minimum pleading requirements." *Rahman v. Schriro*, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)).

### III.   DISCUSSION

#### A.  Federal Claims Against Defendant

The Court construes Plaintiff's complaint to assert a claim under Section 1983 for deliberate indifference to Plaintiff's medical needs and a Fourteenth Amendment equal protection claim, a claim under Section 1981, and a claim under the EMTALA.

##### 1.   Section 1983 Claims

Defendant moves to dismiss the Section 1983 claims on the grounds that Beth Israel Hospital is not a state actor and did not act under color of state law, and therefore cannot be liable under Section 1983.  The Court agrees and finds that Defendant is a private actor excluded from the scope of liability governed by Section 1983.

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

It is well established that "private conduct" is not controlled by Section 1983, unless the "private entity's challenged actions are 'fairly attributable' to the state." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d. Cir. 2014) (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)), *cert. denied*, 135 S. Ct. 1703 (2015).  Courts have found that "a private entity acts under color of state law for purposes of § 1983 when '(1) the State compelled the conduct [the 'compulsion test'], (2) there is a sufficiently close nexus between the State and the private conduct [the 'close nexus test' or 'joint action test'], or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State [the 'public function test'].'"  *Id.* (alterations in original) (quoting *Hogan v.*

*A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009)); *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008). "It is not enough, however, for a plaintiff to plead state involvement in '*some activity* of the institution alleged to have inflicted injury upon a plaintiff'; rather, the plaintiff must allege that the state was involved 'with the *activity that caused the injury*' giving rise to the action." *Sybalski*, 546 F.3d at 257-58 (quoting *Schlein v. Milford Hosp., Inc.*, 561 F.2d 427, 428 (2d Cir. 1977)).

### a. The State Did Not Compel Defendant's Actions

Plaintiff's allegations do not suggest that the State of New York compelled the conduct of which he complains. A private entity may be considered a state actor under the state compulsion test "only when [the State] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Doe v. Rosenberg*, 996 F. Supp. 343, 348-49 (S.D.N.Y. 1998) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)), *aff'd*, 166 F.3d 507 (2d Cir. 1999), *cert. denied*, 528 U.S. 1144 (2000). Thus, absent allegations of significant encouragement from the State, either overt or covert, a plaintiff cannot establish a claim under the compulsion test. *See id.* at 348. It is also established that while the law authorizes a private hospital to perform its duties, it does not compel the hospital's personnel specifically to do anything "any more than repossession laws are passed because states want to encourage creditors to repossess their debtors' goods." *McGugan v. Aldana-Bernier*, No. 11-cv-00342 (TLM), 2012 WL 1514777, at *4 (E.D.N.Y. Apr. 30, 2012) (quoting *Spencer v. Lee,* 864 F.2d 1376, 1379 (7th Cir. 1989)), *aff'd*, 752 F.3d 224.

Here, Plaintiff complains of Defendant's decision not to intern him overnight under "suicide watch" and not to prescribe psychiatric medication. These allegations suggest that Plaintiff asserts he should have been committed. *See* Pl.'s Opp. ¶ 5 ("I should have been put in the psych ward."). New York's Mental Hygiene Law, however, affords private physicians "complete discretion in

deciding whether to commit an individual." *M.C. v. Cty. of Westchester, N.Y.*, No. 16-cv-3013 (NSR),

2018 WL 1275435, at *10 (S.D.N.Y. Mar. 6, 2018) (citing *Rosenberg*, 996 F. Supp. at 349); *see*

*McGugan*, 752 F.3d at 229 (finding no state action where "the state endowed [private] Defendants

with the authority to involuntarily hospitalize (and medicate) the plaintiff, but it did not compel

them to do so"). Plaintiff's submissions do not otherwise suggest that the State took any action to

infringe on that discretion. Defendant's actions as alleged were thus permissive under the law, but

not mandatory, and therefore not compulsory.

### b. Defendant's Actions Were Not Jointly Undertaken with the State

The complaint asserts no facts that fit the requirements of the close nexus test, as Plaintiff

does not claim that state control was close enough in proximity or specificity to Defendant's alleged

conduct to render it state action. *See McGugan*, 752 F.3d at 229. Courts have found a close nexus

when the state was alleged to be "intimately involved" in the decisions of hospitals regarding

treatment and discharge, or when the private hospital in some way consults or contacts state

employees regarding a medical decision. *McGugan*, 2012 WL 1514777, at *6 (citing *Jensen v. Lane City*,

222 F.3d 570, 575 (9th Cir. 2000); *Kia v. McIntyre*, 235 F.3d 749, 757 (2d Cir. 2000)). Plaintiff's

allegations here, however, say nothing regarding the State's involvement in the decision to discharge

him without mental health treatment. Indeed, the complaint suggests that the State was not

involved; Plaintiff was admitted to the emergency room because of coffee burns, and it was Plaintiff,

not a state official or agency, who spoke with attending physicians regarding his mental state. There

are no allegations that the emergency room staff who attended to Plaintiff relied on consultations

with state employees regarding the decision to discharge Plaintiff without further mental health

treatment.

While Defendant, as a hospital, operates in a "highly regulated context," this fact alone is

insufficient to satisfy the close nexus test and render Defendant a state actor for Section 1983

purposes. *McGugan*, 752 F.3d at 229; *see Rosenberg*, 996 F. Supp. at 352 (finding no close nexus between hospital and State where the State had not "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise" (alteration in original) (citation omitted)). Furthermore, while the state licenses hospitals and doctors to practice medicine, this also is not enough to create a sufficient nexus in order to lend Defendant's conduct the "imprimatur" of state action. *Blum*, 457 U.S. at 1003; *see also id.* at 1004-05 (explaining that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State" for constitutional purposes and finding that decisions of private nursing home employees to transfer or discharge residents did not constitute state action when the State was not responsible for those particular actions); *Rosenberg*, 996 F. Supp. at 352-53 (concluding that, because the State "merely licenses private physicians and hospitals to commit involuntary commitments yet in no way influences the decisions to commit, its relationship with the Hospital Defendants is insufficient to pass the close nexus/joint action test").

### c. Defendant Did Not Assume a Traditionally Public Function

Finally, Plaintiff does not allege that Defendant's relevant conduct—providing, or electing not to provide, certain medical services—is traditionally the exclusive prerogative of the State. To plead state action under a public function theory, a plaintiff must allege facts showing that "the private entity assumed powers 'traditionally *exclusively* reserved to the State.'" *Rosenberg*, 996 F. Supp. at 353 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). Indeed, even "[t]he fact that the private party has powers coextensive with the state is irrelevant to determine that state action exists." *Id.* (citing *Harvey v. Harvey*, 949 F.2d 1127, 1131 (11th Cir. 1992)).

Courts in this Circuit have recognized that private hospitals "have not been 'traditionally associated with sovereignty,' and have long been relegated to the private domain, rather than treated as 'traditionally the exclusive prerogative of the State.'" *Jackson v. Barden*, No. 12-cv-1069 (KPF),

2018 WL 340014, at *17 (S.D.N.Y. Jan. 8, 2018) (quoting *Schlein*, 561 F.2d at 429); *see also Heicklen v. U.S. Dep't of Homeland Sec.*, No. 10-cv-2239 (RJH) (JLC), 2011 WL 3841543, at *7 (S.D.N.Y. Aug. 30, 2011) ("Generally, '[a] private hospital is not considered a state . . . actor' for Section 1983 purposes." (alterations in original) (quoting *Urena v. Wolfson*, No. 09-cv-1107 (KAM) (LB), 2010 WL 5057208, at *10 (E.D.N.Y. Dec. 6, 2010))); *Liburd v. Bronx Lenbanon Hosp. Ctr.*, No. 07-cv-11316 (HB), 2008 WL 3861352, at *7 (S.D.N.Y. Aug. 19, 2008) ("Courts have held that the actions of private medical facilities are not 'fairly attributable' to the government despite the presence of government regulation, funding, or both."); *Amofa v. Bronx-Lebanon Hosp. Ctr.*, No. 05-cv-9230 (SHS), 2006 WL 3316278, at *4 (S.D.N.Y. Nov. 13, 2006) ("Unless certain rare conditions exist, private hospitals such as Bronx-Lebanon are not state actors for purposes of Section 1983."). Moreover, "the hospitalization authority that the [mental hygiene law] bestows on hospitals and physicians is not the sort of power traditionally reserved for the State because '[t]he responsibility for [involuntary] commitment lies with the physician as a private individual.'" *Jackson*, 2018 WL 340014, *14 (second and third alterations in original) (quoting *Rosenberg*, 996 F. Supp. at 353).

In light of this precedent, the complaint fails to pass the public function test on its face as it does not allege any facts that suggest that the nature of the relevant conduct is traditionally the exclusive prerogative of the state.

\*  \*  \*  \*

In sum, Plaintiff has alleged insufficient facts to suggest that Defendant has acted under color of state law. Given the well-established law that private physicians are afforded discretion in deciding whether to commit a patient; that State regulation is by itself insufficient to show a joint enterprise between the State and a private hospital; and that the provision of mental health

treatment is not a function traditionally within the exclusive prerogative of the State, Plaintiff's

Section 1983 claims against Defendant are dismissed with prejudice.[2]

### 2. Section 1981 Claim[3]

Plaintiff's allegations that he was denied medical services on the basis of his race suggest that

he brings claims under Section 1981. Section 1981 provides, in relevant part, that "[a]ll persons

within the jurisdiction of the United States shall have the same right in every State and Territory to

make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all

laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . . ."

42 U.S.C. § 1981(a). To state a claim under Section 1981, a plaintiff must allege (1) that the plaintiff

is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant;

and (3) that the discrimination concerned one or more of the activities enumerated in the statute, *i.e.*,

make and enforce contracts, sue and be sued, give evidence, etc. *Brown v. City of Oneonta*, 221 F.3d

329, 339 (2d Cir. 2000); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.

1993) (per curiam).

---

[2] To the extent that Plaintiff brings claims against Beth Israel Hospital in connection with the medical treatment he has received while incarcerated, Plaintiff has not pleaded the personal involvement of Beth Israel Hospital in that treatment. The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). The Second Circuit has defined "personal involvement" to mean direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted) (citation omitted). Even under the liberal pleading standard for *pro se* submissions, the Plaintiff has not sufficiently alleged the involvement of this defendant in his medical treatment while incarcerated. Therefore, setting aside Plaintiff's failure to plead that Beth Israel Hospital is a state actor under Section 1983, Plaintiff has also failed to state a claim for deliberate indifference to his medical needs while incarcerated on the basis of his failure to plead the hospital's involvement in the treatment of those medical needs.

[3] Defendant argues in its reply that the claims based on racial discrimination were not timely and therefore should not be considered by the Court as they were not included in the original complaint and only raised in Plaintiff's opposition. Indeed, it is firmly established that "[n]ew claims not specifically asserted in the complaint may not be considered by courts when deciding a motion to dismiss." *Bernstein v. City of New York*, No. 06-cv-895 (RMB), 2007 WL 1573910, at *10 (S.D.N.Y. May 24, 2007) (alteration in original) (quoting *Lerner v. Forster*, 240 F. Supp. 2d 233, 241 (E.D.N.Y. 2003)). However, this tenet does not apply to *pro se* pleadings. *See Walker*, 717 F.3d at 122 n.1 ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.").

Plaintiff's allegations suggest a Section 1981 claim based on Defendant's discriminatory interference with his right to the "equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981(a); *see Phillip v. Univ. of Rochester*, 316 F.3d 291, 294-98 (2d Cir. 2003) (discussing contract-clause claims and equal-benefit-clause claims under Section 1981 and describing racially motivated torts as basis for equal-benefit claims). Unlike in the case of claims brought under Section 1983, the Second Circuit has held that Section 1981 does not require state action for equal-benefits claims. *See Phillip*, 316 F.3d at 297-98; 42 U.S.C. § 1981(c) ("The rights protected by this section are protected against *impairment by nongovernmental discrimination* and impairment under color of State law." (emphasis added)). Rather, Section 1981 plaintiffs bringing equal-benefit claims must "identify a relevant law or proceeding for the 'security of persons and property'" and establish that "defendants have deprived them of 'the full and equal benefit' of this law or proceeding." *Phillip*, 316 F.3d at 298 (quoting 42 U.S.C. § 1981(a)); *see Pierre v. J.C. Penney Co., Inc.*, 340 F. Supp. 2d 308, 310-13 (E.D.N.Y. 2004) (discussing nexus requirement).

The Second Circuit has declined to define the scope of "laws and proceedings for the security of persons and property." *Phillip*, 316 F.3d at 298 ("We do not here attempt to define the universe of laws and proceedings for the security of persons and property, believing this task best resolved case by case."); *see Corbett v. City of New York*, No. 11-cv-3549 (CBA) (VMS), 2013 WL 5366397, at *20 (E.D.N.Y. Sept. 24, 2013) ("There is little case law interpreting the equal benefit provision of Section 1981, and the Second Circuit has declined to give bright-line guidance as to what activity falls within the equal benefit language." (citation omitted)). *Phillip* did, however, provide some insight into the types of laws that likely fall within the scope of Section 1981. Examining Section 1981's legislative history, *Phillip* noted that Congress expressed particular "concern over private acts motivated by racial discrimination." *Phillip*, 316 F.3d at 295. For example, Congress considered reports that "hatred toward the negro as a freeman is intense among

the low and brutal, who are the vast majority.  Murders, shooting, whippings, robbing, and brutal treatment of every kind are daily inflicted upon them."  *Id.* (quoting Cong. Globe, 39th Cong., 1st Sess. 94 (1865)).  The "fundamental rights" that were to be protected by the statute thus included "the enjoyment of life and liberty" and the freedom to "pursue and obtain happiness and safety." *Id.* (quoting Cong. Globe, 39th Cong., 1st Sess. 339, 475 (1866)).

In light of Section 1981's legislative history, state laws designed to protect medical patients from physicians' negligence, such as New York's medical malpractice laws at issue here, may fall within the ambit of laws protecting the security of persons under Section 1981.  The Court need not decide at this time whether those laws are in fact within the purview of the statute, however, because Plaintiff fails to meet the gating requirement for Section 1981 claims.  While Plaintiff alleges that Defendant refused to treat him because of his race, he fails to identify his race.  Without that fact, the Court cannot conclude that Plaintiff satisfies the first and threshold element of his claim.  *See Brown*, 221 F.3d at 339 (noting that Section 1981 plaintiffs must allege that they belong to a racial minority); *Corbett*, 2013 WL 5366397, at \*21 (finding that plaintiff failed to satisfy the first element of his Section 1981 claim when he pleaded that he was a Caucasian male).[4]  Accordingly, Plaintiff's Section 1981 claim is dismissed.

---

[4]  The Court notes that Plaintiff's allegations regarding Defendant's racial motivation would be sufficient to withstand dismissal at this stage if Plaintiff had pleaded that he belongs to a racial minority.  Plaintiff alleges that Defendant's physicians "refused to treat [him] because of [his] race."  Pl.'s Opp. ¶ 4.  This allegation coupled with Plaintiff's allegations explaining Defendant's conduct are sufficient.  *See Phillip*, 316 F.3d at 298 (finding allegations sufficient where they described in detail the defendants' actions and alleged that defendants "selected them for maltreatment 'solely because of their color'"); *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) (citing *Phillip* and holding that plaintiff sufficiently pleaded disparate treatment on account of her race by alleging that she "is an African American female," describing defendant's action with respect to plaintiff's loan application, and alleging that she "was treated differently from similarly situated loan applicants . . . because of her race, sex, and the location of the property in a predominantly African-American neighborhood"); *cf. Yusuf v. Vassar College*, 35 F.3d 709, 713 (2d Cir. 1994)) (affirming dismissal of Section 1981 claim where plaintiff's allegations did nothing to connect his race with defendant's conduct); *Johnson v. City of New York*, 669 F. Supp. 2d 444, 450 (S.D.N.Y. 2009) ("The mere fact that plaintiff and defendants are of different races, standing alone, is simply insufficient as a factual pleading to allege racially motivated discrimination for purposes of a plausible section 1981 claim.").

### 3. Claims Under the Emergency Medical Treatment and Active Labor Act

In addition to Section 1981 and 1983 claims, Plaintiff's complaint may be construed to allege a breach of the EMTALA. The EMTALA, commonly referred to as the "Patient Anti-Dumping Act," applies to all hospitals that participate in the federal Medicare program and that have emergency departments. *Hardy v. N.Y. City Health & Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999). The EMTALA requires that "if a patient comes to a hospital emergency department and requests treatment for a medical condition, the hospital must screen the patient to determine if he has an emergent condition and examine and treat a patient in such condition 'as may be required to stabilize the medical condition' or provide for the safe transfer of the patient to another hospital." *Lorenz v. Managing Dir., St. Luke's Hosp.*, No. 09-cv-8898 (DAB) (JCF), 2010 WL 4922267, at *8 (S.D.N.Y. Nov. 5, 2010) (quoting 42 U.S.C. § 1395dd(a), (b)(1)), *report and recommendation adopted*, No. 09-cv-8898 (DAB), 2010 WL 4922541 (S.D.N.Y. Dec. 2, 2010). The statute was enacted to ensure that "hospitals [ ] provide medical screening and stabilizing treatment to individuals seeking emergency care in a nondiscriminatory manner." *Id.* (alteration in original) (quoting *Byrne v. Cleveland Clinic,* 684 F. Supp. 2d 641, 651 (E.D. Pa. 2010)). The Act accordingly imposes two principal obligations on hospitals. First, it requires that when an individual seeks treatment in a hospital's emergency room, "the hospital must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition" exists. 42 U.S.C. § 1395dd(a). Second, if the screening examination reveals the presence of an emergency medical condition, the hospital ordinarily must "stabilize the medical condition" before transferring or discharging the patient. *Id.* § 1395dd(b)(1)(A).

The EMTALA has its limits, however. The Act "is not a substitute for state law on medical malpractice. It was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." *Neeseman v. Mt. Sinai West*, No. 17-cv-1766 (LGS), 2018 WL

626358, at \*4 (S.D.N.Y. Jan. 30, 2018) (quoting *Hardy*, 164 F.3d at 792); *see* 42 U.S.C. § 1395dd(f) ("The provisions of this section do not preempt any State or local law requirement . . . ."); *Lorenz*, 2010 WL 4922267, at \*8 (The EMTALA was "not intended to create a federal malpractice statute or cover cases of hospital negligence." (citation omitted)); *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 880 (4th Cir. 1992) ("Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery.").

Thus, "[i]n order to state a claim under the EMTALA, a plaintiff must allege that he went to the emergency room of a participating hospital seeking treatment for a medical condition, and that the hospital did not adequately screen him to determine whether he had an emergency medical condition, or discharged or transferred him before such a condition had been stabilized." *Kolari v. New York-Presbyterian Hosp.*, 382 F. Supp. 2d 562, 573-574 (S.D.N.Y. 2005), *vacated in part on other grounds*, 455 F.3d 118 (2d Cir. 2006); *see also Fisher ex rel. Fisher v. New York Health and Hosps., Corp.,* 989 F. Supp. 444, 448 (E.D.N.Y. 1998) (same).

### a. Failure to Screen

EMTALA's requirement that individuals seeking emergency care receive an "appropriate medical screening examination" obligates hospitals to "apply uniform screening procedures to all individuals coming to the emergency room." *Matter of Baby K*, 16 F.3d 590, 595 (4th Cir.), *cert. denied,* 513 U.S. 825 (1994); *see Baber*, 977 F.2d at 879; *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994) (holding that EMTALA's screening provision "requires a hospital to provide indigent patients with a medical screening similar to one which they would provide any other patient").

Here, Plaintiff's allegations suggest that he brings a claim under the EMTALA not for failure to screen, but for failure to stabilize his emergency medical condition. Plaintiff alleges that he was seen by an emergency room physician, who directed another hospital employee to speak with

Plaintiff regarding "why and how [he] was feeling." Compl. ¶ II.D. Plaintiff's allegations regarding the hospital's financial and racial discrimination against him are pleaded in connection with Defendant's failure to medicate him and intern him, and not in connection with the screening itself. Therefore, the Court reads Plaintiff's complaint as raising a claim under the EMTALA for the hospital's failure to stabilize him before discharging him.

**b. Failure to Stabilize**

The EMTALA requires "such treatment as may be required to stabilize the medical condition," 42 U.S.C. § 1395dd(b)(1)(A), and forbids the patient's release unless his condition has "been stabilized," *id.* § 1395dd(c)(1). The statute defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . [*inter alia*] placing the health of the individual . . . in serious jeopardy[.]" *Id.* § 1395dd(e)(1)(A)(i). An acute psychiatric condition can qualify as an "emergency medical condition" under EMTALA. *See* 42 C.F.R. § 489.24(b) (defining "emergency medical condition" to include "psychiatric disturbances and/or symptoms of substance abuse"); *Thomas v. Christ Hosp. and Med. Ctr.*, 328 F.3d 890, 893-94 (7th Cir. 2003) ("Once an emergency medical condition is detected, the hospital must act to stabilize the condition—whether physical or psychiatric—before the patient can be transferred or released" (citing 42 U.S.C. § 1395dd).

A patient with an emergency medical condition is "stabilized" when "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during" the patient's release from the hospital. 42 U.S.C. § 1395dd(e)(3)(B). Thus, the EMTALA requires a hospital to treat a patient with an emergency condition in such a way that, upon the patient's release, no further deterioration of the condition is likely. *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 582 (6th Cir. 2009). A psychiatric patient is considered stable for purposes

of discharge under EMTALA "when he/she is no longer considered to be a threat to him/herself or others." *Thomas*, 328 F.3d at 893 (applying the Health Care Financing Administration's definition of stability for psychiatric patients).

Importantly, though, a stabilization claim exists only when "the patient had an emergency condition" *and* "the hospital actually knew of that condition." *Baber,* 977 F.2d at 883. The Act does not hold hospitals accountable for failing to stabilize conditions of which they are unaware, or even conditions of which they should have been aware. *Id.*; *accord Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996).

Here, Plaintiff states that he informed his attending physician that he was both suicidal and homicidal. Compl. ¶ II.D. He also alleges that he described in detail the basis for his mental state to his attending doctor and that he advised "the doctors in Beth Israel [he] was going to kill [himself] or some one [sic] else" and he "had no real reason to live." Pl.'s Opp. ¶ 5. Given Plaintiff's allegations that he informed multiple physicians of his suicidal sentiment, the Court is satisfied that Plaintiff plausibly pleads that he presented with an emergency medical condition and that Defendant actually knew of his condition.

Plaintiff's complaint also sufficiently suggests that he was discharged prior to being stabilized. He alleges that, despite having informed multiple emergency department physicians of his mental state and his desire to kill, he was discharged without medication or further observation. Compl. ¶ II.D.; Pl.'s Opp. ¶ 5. Immediately after Plaintiff was discharged, he assaulted three N.Y.P.D. officers. Compl. ¶ III. Therefore, drawing all reasonable inferences in favor of Plaintiff, and reading his submissions to raise the strongest claims they suggest, the Court is satisfied that Plaintiff has stated a claim under the EMTALA for Defendant's failure to stabilize him before discharging him. *See, e.g.*, *Mahone v. Med. Ctr., Inc.*, No. 17-cv-113 (MSH,) 2017 WL 6559911, at *8-9 (M.D. Ga. Dec. 22, 2017) (finding failure to stabilize claim plausibly pleaded when plaintiff alleged

"suicidal ideations, depression, PTSD, and hallucinations" that were not stabilized prior to plaintiff's transfer); *Carlisle v. Frisbie Mem'l Hosp.*, 888 A.2d 405, 414 (N.H. 2005) (holding that jury questions existed on EMTALA claims where plaintiff alleged hospital transferred her to jail without proper stabilization while she was intoxicated and suicidal).

## B. State Claims against Defendant

Plaintiff's complaint, construed broadly, asserts claims under New York state law for medical malpractice, negligence, and discrimination.

### 1. Medical Malpractice and Negligence Claims

Under New York law, "there is no prohibition against simultaneously pleading both an ordinary negligence cause of action and one sounding in medical malpractice." *Ingutti v. Rochester Gen. Hosp.*, 44 N.Y.S.3d 274, 275-76 (4th Dep't 2016); *see also Piccoli v. Panos,* 13 N.Y.S.3d 478, 479 (2d Dep't 2015); *Miller ex rel. Miller v. Albany Med. Ctr. Hosp.,* 464 N.Y.S.2d 297, 299 (3d Dep't 1983). "It is simply beyond cavil 'that an action for personal injuries may be maintained, in the proper case, on the dual theories of medical malpractice or simple negligence where a person is under the care and control of a medical practitioner or a medical facility.'" *Ingutti*, 44 N.Y.S.3d at 276 (quoting *Twitchell v. MacKay,* 434 N.Y.S.2d 516, 518 (4th Dep't 1980)). "Moreover, in a proper case, both theories may be presented to the jury." *Id.*

In determining whether an action sounds in medical malpractice or simple negligence, the critical question is the nature of the duty to the plaintiff which the defendant is alleged to have breached. When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence. *La Russo v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 304 (S.D.N.Y. 2013) (citations omitted), *aff'd*, 747 F.3d 90 (2d Cir. 2014); *see also Sweeney v. Presbyterian/Columbia Presbyterian Med. Ctr.,* 763 F. Supp. 50, 52 (S.D.N.Y. 1991) (discussing the difference, under New York law,

between negligence and malpractice claims in a medical context, and noting that the New York Court of Appeals has held that "conduct which constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician is medical malpractice" (internal citation and quotation marks omitted)).

### a. Medical Malpractice

To establish liability in a medical malpractice action under New York law, "a plaintiff must prove (1) the standard of care in the locality where the treatment occurred, (2) that the defendant breached that standard of care, and (3) that the breach of the standard was the proximate cause of the injury." *Zak v. Brookhaven Mem'l Hosp. Med. Ctr.*, 863 N.Y.S.2d 821, 822 (2d Dep't 2008) (quoting *Berger v. Becker*, 709 N.Y.S.2d 418 (2d Dep't 2000). To survive a motion to dismiss, a plaintiff must allege the defendant's deviation from "accepted medical practice" and a causal nexus between the deviation and the harm suffered by the plaintiff. *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 327-28 (S.D.N.Y. 2008); *see also Lorenz*, 2010 WL 4922267, at *11 (finding that the plaintiff adequately pleaded medical malpractice when he alleged that he was a patient at the defendant hospital, that hospital physicians "made treating decisions that might plausibly be deviations from accepted medical practice," and that those decisions caused him injury).[5]

Plaintiff alleges that he was "discharged without medical treatment for [his] mental state and because of that [his] goal was to hurt a police officer." Compl. ¶ II.D. He also alleges that, due to his mental state, he "did not control [his] emotions and it lead [sic] to careless actions," namely his assault of the three police officers. Pl.'s Opp. ¶ 5. Defendant does not contest that Plaintiff has

---

[5] The Court understands Plaintiff's medical malpractice claims against the hospital to be asserted on the basis of the hospital's vicarious liability for the malpractice of its doctors. *See Kavanaugh by Gonzales v. Nussbaum*, 71 N.Y.2d 535, 546 (1988) (noting that "[v]icarious liability applies to hospitals and physicians" and finding hospital vicariously liable for negligence of its employee physician); *Hill v. St. Claire's Hosp.*, 67 N.Y.2d 72, 75 (1986) (holding that owner of medical clinic held out to the public as offering medical services could be held vicariously liable for malpractice of treating doctor).

pleaded an actionable injury. Therefore, the Court accepts, for purposes of this motion, that Plaintiff has sufficiently pleaded an injury.[6]

Turning to the other elements of Plaintiff's claim, Plaintiff does not expressly allege the applicable standard of care. Rather, he states that he "should have been medicated" yet "was not" and that "by law they were not suppose [sic] to release" him in the condition in which he was upon discharge. Pl.'s Opp. ¶ 5. He also explains that he has been on psychiatric medication since 2005, had been "in and out of the psych wards" at various other hospitals, and that the emergency room physicians at Defendant's hospital "knew" that he needed help. *Id.* ¶¶ 3, 5. Plaintiff described his homicidal and suicidal thoughts to the physicians, and to his treating doctor in detail. *Id.*; Compl. ¶ II.D. Nonetheless, the only task that Defendant is alleged to have undertaken to address Plaintiff's mental state was to direct an individual to speak with Plaintiff about his feelings. Compl. ¶ II.D. Plaintiff alleges this was insufficient, as he left the hospital with suicidal thoughts intact and assaulted police officers in the hope that he would fall victim to their deadly assault in return. *Id.*; Pl.'s Opp. ¶ 5. These allegations suffice to plausibly plead a deviation from the standard of care. They suggest that the applicable standard of care required admission for psychological observation—as other New York City hospitals had admitted Plaintiff to their psych wards—or medication—as Plaintiff had been on psychiatric drugs for twelve years—and that Defendant deviated from that standard of care by releasing Plaintiff after only having an employee speak with him about his feelings.

---

[6] To the extent that Plaintiff's medical malpractice and negligence claims are premised on physical injuries that Plaintiff received during the alleged assault by the police officers, those claims contravene public policy and, therefore, necessarily fail. The New York Court of Appeals has held that "when the plaintiff has engaged in activities prohibited, as opposed to merely regulated, by law, the courts will not entertain the suit if the plaintiff's conduct constituted a serious violation of the law and the injuries for which he seeks recovery were the direct result of that violation." *Barker v. Kallash*, 63 N.Y.2d 19, 24 (1984); *see Hernandez v. Yoon*, 661 N.Y.S.2d 753, 754 (N.Y. Sup. Ct. 1997) ("Cases where recovery has been barred or would be barred because the plaintiff was engaged in criminal activity at the time of injury frequently involve conduct dangerous to physical well-being."). At the time that Plaintiff alleges *he* was assaulted by the officers, he was engaged in the criminal activity of assaulting *them*. Plaintiff's actions were not only regulated, but prohibited by law. *See* N.Y. Penal Law § 120.08. Accordingly, Plaintiff is precluded from pursuing compensation for any damages that were caused by the officers' acts in allegedly assaulting and arresting him.

Plaintiff's submissions also plausibly plead that Defendant's deviation from the standard of care was the proximate cause of his injury—his inability to control his emotions and his ongoing suicidal ideations that led to his attack of the N.Y.P.D. officers. The complaint alleges that it was because of his lack of medication and his early discharge that he desired to commit suicide by cop, and that the assault on the officers was carried out the same day that Plaintiff was discharged from Defendant's hospital. Compl. ¶ II.D; Pl.'s Opp. ¶ 5. These allegations suggest a causal link between Defendant's alleged deviation from the standard of care and the harm suffered by Plaintiff and are sufficient to survive a motion to dismiss. *See Rennalis v. Alfredo*, No. 12-cv-5300 (KMK), 2015 WL 5730332, at *13 (S.D.N.Y. Sept. 30, 2015) (finding allegations that defendant denied plaintiff scans and a hearing test and that plaintiff suffered severe degenerations with worsening pain to his spine sufficient under New York law to plead causation in connection with medical malpractice claim); *Gale v. Smith & Nephew, Inc.*, 989 F. Supp. 2d 243, 252 (S.D.N.Y. 2013) (finding allegations of causation sufficient at the pleading stage where a "reasonable reading" of the complaint showed that plaintiff alleged the defendant was "at least in part" responsible for surgery and aftercare that caused his injuries); *cf. Imperati v. Lee*, 18 N.Y.S.3d 615, 616 (1st Dep't 2015) (finding conclusory allegation of causal connection insufficient).

Accordingly, Defendant's motion to dismiss the medical malpractice claim is denied.[7]

### b. Negligence

While dual claims for medical malpractice and negligence may be brought under New York law, a proper basis for each is required. *Ingutti*, 44 N.Y.S.3d at 276. Under New York law, conduct

---

[7] Defendant makes much of Plaintiff's unlikely ability to retain a medical expert to prove his medical malpractice claim, including the causal link between the alleged deviation from the standard of care and Plaintiff's injury. *See* Def.'s Mem. in Supp. of Mot. to Dismiss, ECF No. 20 ("Def.'s Mem.") at 15; Def.'s Reply, ECF No. 32 ("Def.'s Reply") at 8-9. The Court is not required at this stage to decide whether a deviation from the standard of care or proximate causation exist—only whether they are plausibly pleaded. Nonetheless, the Court acknowledges that expert testimony may be required at future stages of the litigation of Plaintiff's claims. *See Deadwyler v. N. Shore Univ. Hosp. at Plainview*, 866 N.Y.S.2d 306, 307 (2d Dep't 2008) ("Expert testimony is necessary to prove a deviation from accepted standards of medical care and to establish proximate cause." (quoting *Nichols v. Stamer*, 854 N.Y.S.2d 220, 222 (2d Dep't 2008))).

that "'constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician' is medical malpractice, whereas conduct such as a claim that a hospital failed to provide a patient with competent and qualified nurses or failed to promulgate rules requiring doctors to take adequate medical histories from patients sounds in negligence." *Sweeney*, 763 F. Supp. at 52 (quoting *Bleiler v. Bodnar*, 489 N.Y.S.2d 885, 889 (1985)); *see also La Russo*, 747 F.3d at 101 (affirming dismissal of negligence claim that was substantially related to medical treatment and "merely a reformulation of [plaintiff's] medical malpractice claim"); *Friedmann v. N.Y. Hosp.-Cornell Med. Ctr.*, 884 N.Y.S.2d 733, 734 (1st Dep't 2009) ("Simple negligence principles are applicable to those cases where the alleged negligent act may be readily determined by the trier of fact based on common knowledge. However, where the directions given or treatment received by the patient is in issue, consideration of the professional skill and judgment of the practitioner or facility is required and the theory of medical malpractice applies.").

Here, Plaintiff's complaint, even liberally construed, alleges no facts that plausibly suggest that Defendant acted negligently apart from its failure to medicate and to admit Plaintiff for further observation. Therefore, any claim for ordinary negligence brought by Plaintiff is dismissed.

### 2. Unlawful Discrimination

Plaintiff alleges in the complaint that the emergency room physicians treated him "poorly" and discharged him without mental health treatment because they believed him to be homeless. Compl. ¶ II.D. In his opposition, Plaintiff expands by asserting that "this is not only a medical malpractice case . . . it's a racial discrimination case as well" and that he was "refused treatment" because of his race and perceived financial status. Pl.'s Opp. ¶ 4. The Court construes these allegations as raising claims of discrimination under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

### a. NYSHRL Claim

Defendant moves to dismiss any claim brought under the NYSHRL because such a claim "must be brought in New York state court since causes of action under the NYHRL arise under New York law." Def.'s Reply in Supp. of Mot. to Dismiss, ECF No. 32 ("Def.'s Reply") at 10. Defendant apparently forgets that any NYSHRL claim is before the Court under the Court's supplemental jurisdiction, as the claim arises from the same nucleus of operative facts as the EMTALA claim and forms part of the same case or controversy. *See* 28 U.S.C. § 1367(a) (federal district courts have supplemental jurisdiction over state law claims "that are so related to" federal claims "that they form part of the same case or controversy").

Supplemental jurisdiction is "discretionary," *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and courts in this Circuit generally decline to exercise supplemental jurisdiction over a claim that is part of the same case or controversy as a federal claim only when the court "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c); *see Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 399 (2d Cir. 2017) ("[A] district court 'cannot exercise supplemental jurisdiction unless there is first a proper basis for original federal jurisdiction." (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996))); *Kolari*, 455 F.3d at 122 ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988))). Indeed, courts in this Circuit routinely exercise supplemental jurisdiction over claims brought under the NYSHRL where the related federal claims proceed to be litigated. *See, e.g., D'Eredita v. ITT Water Tech., Inc.*, 677 F. App'x 686, 688 (2d Cir. 2017) (upholding district court's exercise of supplemental jurisdiction over plaintiff's NYSHRL claims); *Kolenovic v. ABM Indus., Inc.*, 361 F. App'x 246, 248 (2d Cir. 2010) (affirming district court's grant of summary judgment on plaintiff's federal and NYSHRL claims); *Vuona v. Merrill Lynch &*

*Co., Inc.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (exercising supplemental jurisdiction over NYSHRL claim when it formed part of the same case or controversy as a claim brought under the Americans with Disabilities Act).

Here, Plaintiff's NYSHRL claim is based on the medical services, or lack thereof, that he received on March 6 and 7, 2017 at Defendant's emergency room. The facts on which the NYSHRL claim is predicated are, thus, the same facts on which Plaintiff's federal claim under the EMTALA is based. Because the Court has not dismissed the EMTALA claim and the two claims are related so as to form part of the same case or controversy, the Court exercises supplemental jurisdiction over the NYSHRL claim.

The NYSHRL makes it unlawful for "any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . because of the race . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ." N.Y. Exec. Law § 296(2)(a); *see In re Cahill v. Rosa*, 89 N.Y.2d 14, 23 (1996) (NYSHRL "deems it unlawful discrimination if a place of public accommodation denies its accommodations to any person on the basis of 'race, creed, color, national origin, sex, or disability or marital status.'"). At the pleading stage, a plaintiff is required to allege facts sufficient to give rise to an inference of discrimination. *See Schwarz v. Consolidated Edison, Inc.*, 47 N.Y.S.3d 9, 11 (1st Dep't 2017); *Emengo v. State*, 40 N.Y.S.3d 30, 32 (1st Dep't 2016). However, "[t]hreadbare recitals of the elements of a [NYSHRL] cause of action, supported by mere conclusory statements are not enough." *Iqbal*, 556 U.S. at 678; *Akinsanya v. N.Y. City Health & Hosps. Corp.*, No. 16-cv-3332 (VEC) (KNF), 2017 WL 4049246, at *6 (S.D.N.Y. July 28, 2017), *report and recommendation adopted*, No. 16-cv-3332 (VEC) (KNF), 2017 WL 4023138 (S.D.N.Y. Sept. 12, 2017).

As an initial matter, an individual's perceived financial status is not a protected class under the NYSHRL. *See* N.Y. Exec. Law § 296(2)(a) (listing classes protected against discrimination). Therefore, Plaintiff's NYSHRL claim premised on any discrimination by the hospital based on his perception as a homeless man is dismissed with prejudice.

With respect to Plaintiff's claim of discrimination based on his race, Plaintiff has not alleged facts that suggest even an inference of discrimination. He states in conclusory fashion that Defendant "refused to treat" him because of his race but does not allege his race or that other patients of other races were treated any differently than he was. Without more, Plaintiff's racial discrimination claim under the NYSHRL cannot survive.

### 3. Other State Law Claims

To the extent that Plaintiff's complaint may be construed to allege other claims under New York state law, including a claim under the New York City Human Rights Law, Defendant has not moved to dismiss those claims.[8] Accordingly, Plaintiff will have the opportunity to further litigate those claims.

### C. Leave to Replead

The Second Circuit has advised that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). However, where a court does not find that the complaint, liberally construed, "suggests that the plaintiff has a claim that she has inadequately or inartfully pleaded," but instead that "[t]he problem with [the plaintiff's] causes of action is substantive [and] better pleading will not cure it,"

---

[8] Defendant argues only that the Court should decline to exercise supplemental jurisdiction over any state law claims in the event Plaintiff's federal claims survive dismissal. *See* Def.'s Reply at 14. As explained earlier, the Court exercises supplemental jurisdiction over the state law claims that form part of the same case or controversy as Plaintiff's EMTALA claim.

"[r]epleading would [ ] be futile" and leave to replead "should be denied." *Id.* (citing *Hunt v. All. N. Am. Gov't Income Tr.*, 159 F.3d 723, 728 (2d Cir. 1998)).

Here, as explained, Plaintiff's Section 1983 claims are precluded by well-established law. Therefore, repleading those claims would be futile, and Plaintiff is not granted leave to amend those claims. Plaintiff's Section 1981 and NYSHRL claims, on the other hand, do not suffer from the same substantive deficiencies, and Plaintiff is granted leave to amend his complaint to address the insufficiencies in connection with those claims.

## IV.    CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiff's Section 1983 claims are dismissed with prejudice. Plaintiff's Section 1981 claim is dismissed without prejudice. Plaintiff's EMTALA claim survives.

Plaintiff's NYSHRL claim is dismissed without prejudice. Plaintiff's other state law claims survive.

Plaintiff is granted leave to replead his Section 1981 and NYSHRL claims no later than 30 days following the date of this order. Plaintiff is advised that an amended complaint will replace, not supplement, the original complaint.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Court requests that counsel for Defendant provide Plaintiff with copies of unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 18 and to mail a copy of this opinion to Plaintiff by certified mail.

SO ORDERED.

Dated: April 11, 2018
New York, New York

GREGORY N. WOODS
United States District Judge